## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**BERNARD VERRETT**                                    CIVIL ACTION

**VERSUS**                                             NO. 19-0351

**DARREL VANNOY, WARDEN**                              SECTION: "T"(5)

### REPORT AND RECOMMENDATION

This matter was referred to the undersigned United States Magistrate Judge to conduct a hearing, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.    Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing.    *See* 28 U.S.C. § 2254(e)(2). For the following reasons, **IT IS RECOMMENDED** that the petition for habeas corpus relief be **DISMISSED WITH PREJUDICE**.

### Procedural History

Petitioner, Bernard Verrett, is a convicted inmate currently incarcerated at the Louisiana State Penitentiary in Angola, Louisiana.    On November 18, 2010, he was charged by bill of indictment with second-degree murder.[1]    A jury subsequently found him guilty as

---

[1]  State Rec., Vol. 1 of 11, Bill of Indictment; Minute Entry, 11/18/10.

charged.[2]    On May 7, 2012, his motions for post-verdict judgment of acquittal and for new trial were denied.[3]    On May 10, 2012, he was sentenced to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence.[4]    His motion to reconsider the sentence was denied.

On direct appeal, he assigned as his sole ground for error that the evidence was not sufficient to support a conviction for second-degree murder.    On December 27, 2013, the Louisiana First Circuit Court of Appeal affirmed his conviction and sentence.[5]    On June 20, 2014, the Louisiana Supreme Court denied his application for writ of certiorari.[6]

On September 2, 2015, Verrett submitted an application for post-conviction relief to the state district court.[7]    In that application, he asserted the following claims:    (1) he was denied effective assistance of trial counsel for failing to prepare and present a viable defense that included expert-witness testimony; (2) he was refused adequate funding to hire expert witnesses to assist in preparing a defense; (3) he was improperly denied a change of venue

---

[2]  State Rec., Vol. 1 of 11, Minute Entries, 2/27/12 through 3/2/12.

[3]  State Rec., Vol. 1 of 11, Minute Entry, 5/7/12.

[4]  State Rec., Vol. 1 of 11, Minute Entry, 5/10/12.

[5]  *State v. Verrett*, 2013-KA-0632, 2013 WL 6858335 (La. App. 1st Cir. 12/27/13); State Rec., Vol. 3 of 11.

[6]  *State v. Verrett*, 2014-KO-0168 (La. 6/20/14), 141 So.3d 808; State Rec., Vol. 3 of 11.

[7]  State Rec., Vol. 3 of 11, Uniform Application for Post-Conviction Relief.

in violation of due process and his right to a fair and impartial jury; and (4) cumulative error denied him a fair trial.    On February 15, 2017, the state district court denied his application for post-conviction relief.[8]    He filed a notice of intent to seek writs and was granted a return date of April 7, 2017.[9]    He filed his related writ application with the Louisiana First Circuit on March 14, 2017.[10]    On May 25, 2017, Verrett's supervisory writ application was "denied on the showing made" by the Louisiana First Circuit Court of Appeal.[11]    The court of appeal determined that the writ application did not include all pertinent documentation, but allowed him additional time, until July 20, 2017, to file a new application with the court. Verrett timely did so on July 18, 2017.[12]    On September 15, 2017, the Louisiana First Circuit denied his writ application.[13]    On October 10, 2017, he filed a writ application with the Louisiana Supreme Court.    On January 8, 2019, the Louisiana Supreme Court denied relief.[14]

---

[8]   State Rec., Vol. 3 of 11, State District Court Judgment denying PCR, 2/15/17.

[9]   State Rec., Vol. 3 of 11, Notice of Intent with Order signed March 8, 2017.

[10]   State Rec., Vol. 4 of 11, First Circuit Court of Appeal Writ No. 2017 KW 0373.

[11]   State Rec., Vol. 3 of 11, *State v. Verrett*, 2017 KW 0373, 2017 WL 2295061 (La. App. 1st Cir. May 25, 2017).

[12]   State Rec., Vol. 5 of 11, First Circuit Court of Appeal Writ No. 2017 KW 1004.

[13]   State Rec., Vol. 3 of 11; *State v. Verrett*, 2017 KW 1004, 2017 WL 4082791 (La. App. 1st Cir. Sept. 15, 2017).

[14]   *State ex rel. Verrett v. State*, 2017-KH-1809 (La. 1/8/19), 260 So.3d 583; State Rec.,

On January 14, 2019, Verrett filed his federal application for habeas corpus relief asserting the same three claims for relief asserted in his post-conviction relief proceedings.[15] In response, the State argues that the federal application is untimely.[16]   Verrett filed a reply to the State's response.[17]

### Preliminary Review-Timeliness

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") generally requires that a petitioner bring his Section 2254 claims within one year of the date on which his underlying criminal judgment becomes "final."[18]   With regard to finality, the United

---

Vol. 11 of 11.

[15]  Rec. Doc. 3, Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus.

[16]  Rec. Doc. 9.

[17]  Rec. Doc. 10.

[18]  Title 28 U.S.C. § 2244(d) provides additional grounds, which do not apply here:

(1)    A 1–year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—

A.    the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

B.    the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

C.    the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively

States Fifth Circuit Court of Appeals has explained:

> The statute of limitations for bringing a federal habeas petition challenging a state conviction begins to run on "the date on which the [state] judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). *When a habeas petitioner has pursued relief on direct appeal through his state's highest court, his conviction becomes final ninety days after the highest court's judgment is entered, upon the expiration of time for filing an application for writ of certiorari with the United States Supreme Court. Roberts v. Cockrell*, 319 F.3d 690, 693 (5th Cir. 2003).

*Butler v. Cain*, 533 F.3d 314, 317 (5th Cir. 2008) (emphasis added).

The Louisiana Supreme Court denied Verrett's application for writ of review associated with his direct appeal on June 20, 2014.   Accordingly, for purposes of the AEDPA, his conviction became final, and his federal limitations period therefore commenced, 90 days later, on September 18, 2014.   The federal limitations period expired one year later, unless that deadline was extended through tolling.

Regarding statutory tolling, the AEDPA expressly provides that "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."   28 U.S.C. § 2244(d)(2).   After 348 days elapsed, Verrett tolled his federal limitations period by filing a post-conviction application with the

---

applicable to cases on collateral review; or

D.    the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

state district court on September 2, 2015.    Tolling then continued uninterrupted for the duration of the post-conviction proceedings, so long as he sought supervisory review in a timely manner.    *Grillette v. Warden, Winn Correctional Center*, 372 F.3d 765, 769–71 (5th Cir. 2004).

In this case, the State argues that tolling ceased when Verrett's first writ application filed with the Louisiana First Circuit Court of Appeal was considered defective because he failed to attach all pertinent supporting documentation.[19]    The State notes that a state application must be "properly filed" to toll the federal limitations period.    Thus, according to the State, the improperly-filed writ application had no effect on the federal limitations period, which continued to run another 103 days until Verrett properly filed his next writ application with the intermediate court.    While that position is not untenable, the Court declines to rigidly apply the rule in this case where the state court invited Verrett to correct the defects, refile his application, and provided him an extended time frame in which to do so.    As instructed, Verrett timely refiled his corrected application, which the Louisiana First Circuit then considered, as did the Louisiana Supreme Court, when he filed his related writ

---

[19]    Though not cited in the Louisiana First Circuit's writ ruling, Rule 4-5 of the Uniform Rules, Louisiana Courts of Appeal sets forth generally the items that must be included with an application.    The writ ruling reflected that Verrett's application did not include a copy of his indictment, the state's answer to his application for post-conviction relief, all pertinent transcripts and minute entries, any documentation regarding funding for experts, his motion for change of venue, and any other portions of the district court record that might support the claims raised in the application for post-conviction relief. State Rec., Vol. 3, *State v. Verrett*, 2017 KW 0373 (La. App. 1st Cir. 2017).

application from that intermediate court ruling.     In this instance, the Court is unwilling to adopt the State's calculations that include untolled time attributed to the period during which Verrett's first intermediate state-court supervisory writ application was pending. *See Gordon v. McCain*, Civ. Action No. 15-2303, 2015 WL 9703424 (E.D. La. Dec. 22, 2015) (declining to find federal application untimely for an interruption of tolling due to technical defects in intermediate state-court writ application); *Roberts v. Cain*, Civ. Action No. 15-963, 2015 WL 7080546 (E.D. La. Nov. 13, 2015) (finding an implicit extension of time and no interruption of tolling attributed to intermediate state-court writ application with technical defects that was refiled within the extended time given).

The State does not allege that the subsequent supervisory writ applications filed with the Louisiana First Circuit or the Louisiana Supreme Court were untimely or otherwise defective.     Thus, giving statutory tolling credit for each of Verrett's post-conviction filings from September 2, 2015 through January 8, 2019, his federal application filed on January 14, 2019, was timely.     The Court will therefore consider his claims on the merits.

## Facts

On direct appeal, the Louisiana First Circuit briefly summarized the facts adduced at trial:

> On July 16, 2010, defendant and his wife, Kristi Verrett, went to a wedding. Following the reception, they went to Cajun Country Lounge. At about 2:00 a.m. (July 17, a Saturday), they arrived at home at Morello Court in Houma. Their three children were still awake. Defendant began badgering Kristi and calling her names. According to two of their children, Nicholas and Nicole, who testified at trial, defendant's verbal abuse of Kristi was a common occurrence.

At about 3:30 a.m., defendant and Kristi left the house to go get something to eat. While Kristi was driving their vehicle, a Toyota Corolla, she and defendant began arguing. Kristi stopped the vehicle on or near Savanne Road. Defendant retrieved a kitchen knife from the floorboard and repeatedly stabbed Kristi. He then took Kristi to a nearby swampy area and covered her body with grass. The defendant drove the Corolla to the other side of Terrebonne Parish and attempted to dispose of the vehicle by submerging it in water. The police subsequently found the Corolla underwater in a bayou at Grand Caillou.

The police began searching for defendant, but were unable to find him on Saturday. On Sunday, July 18, 2010, the police proceeded to Shrimpers Row near Butch Court after receiving information that defendant had been sighted there. As the police approached defendant, he ran and hid in a scrap yard. As more deputies arrived and commanded he come out, defendant complied. When the police attempted to seize defendant, he resisted and became recalcitrant. When one of the officers drew his Taser, defendant stopped resisting and was arrested and Mirandized. During questioning, defendant admitted he stabbed Kristi, and he took the police to the location where he dumped her body.

Dr. Susan Garcia, a forensic pathologist, performed the autopsy on Kristi. She testified at trial that Kristi had eighteen sharp-force injuries, caused by a single-edge blade, to her chest, abdomen, back, neck, shoulder, and arm. Four of the more serious wounds were the two in her chest and the two in her abdomen. According to Dr. Garcia, the wounds to Kristi's liver and right lung were fatal.[20]

### Standards of Review on the Merits

Title 28 U.S.C. § 2254(d)(1) and (2), as amended by The Antiterrorism and Effective

Death Penalty Act of 1996 (AEDPA), provides the applicable standards of review for pure

questions of fact, pure questions of law, and mixed questions of both.    A state court's purely

factual determinations are presumed to be correct and a federal court will give deference to

---

[20]  *State v. Verrett*, 2013 KA 0632, 2013 WL 6858335, at *1 (La. App. 1st Cir. 2013).

the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."    28 U.S.C. § 2254(d)(2); *see also* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").    With respect to a state court's determination of pure questions of law or mixed questions of law and fact, a federal court must defer to the decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

The "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning."    *Bell v. Cone*, 535 U.S. 685, 694 (2002).    A state-court decision is "contrary to" clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the United States Supreme Court's cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of the United States Supreme Court and nevertheless arrives at a result different from United States Supreme Court precedent.    *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000); *Wooten v. Thaler*, 598 F.3d 215, 218 (5th Cir.), *cert. denied*, 131 S.Ct. 294 (2010).    An "unreasonable application" of [United States Supreme Court] precedent occurs when a state court

"identifies the correct governing legal rule... but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407-08; *White v. Woodall*, 134 S.Ct. 1697, 1706 (2014).

It is well-established that "an unreasonable application is different from an incorrect one." *Bell*, 535 U.S. at 694. A state court's merely incorrect application of Supreme Court precedent simply does not warrant habeas relief. *Puckett v. Epps*, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable."). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable" under the AEDPA. *Harrington v. Richter*, 562 U.S. 86, 102 (2011). Section 2254(d) preserves authority to issue the writ in cases where there is "*no possibility* fairminded jurists could disagree that the state court's decision conflicts with [United States Supreme Court] precedents." *Id.* (emphasis added); *see also Renico v. Lett*, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants—and federal courts—from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.").

## Claims for Relief

### A.  Ineffective Assistance of Counsel

Verrett asserts generally that trial counsel was constitutionally ineffective for failing to perform adequate pretrial discovery and investigation, interview and call witnesses, use

all available evidence and witnesses, secure a qualified expert to discuss the effects of intoxication on the formation of specific intent, and present a viable defense.[21]   Specifically, he argues that expert testimony was required to show the "adverse psychological effects of steroids, stress and depression."[22]   He reasons that "[a]n expert could have assisted the defense in establishing that Verrett committed 'manslaughter' rather than second degree murder."[23]   Without a psychiatric or forensic expert, he contends he had no viable defense.

Verrett raised the ineffective-assistance claim in his application for post-conviction relief.   The state district court reviewed and denied the claim under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984).   The Louisiana First Circuit denied his supervisory writ application without stated reasons.   The Louisiana Supreme Court denied his related writ application finding he failed to establish ineffective assistance of counsel under the standard of *Strickland v. Washington*.

The United States Supreme Court has established a two-pronged test for evaluating claims of ineffective assistance of counsel.   Specifically, a petitioner seeking relief must demonstrate both that counsel's performance was deficient and that the deficient performance prejudiced his defense.   *Strickland v. Washington*, 466 U.S. 668, 697 (1984). A petitioner bears the burden of proof on such a claim and "must demonstrate, by a

---

[21]   Rec. Doc. 3, p. 24.

[22]   *Id*.

[23]   *Id*.

preponderance of the evidence, that his counsel was ineffective." *Jernigan v. Collins*, 980 F.2d 292, 296 (5th Cir. 1993); *see also Clark v. Johnson*, 227 F.3d 273, 284 (5th Cir. 2000). If a court finds that a petitioner has made an insufficient showing as to either of the two prongs of inquiry, *i.e*, deficient performance or actual prejudice, it may dispose of the ineffective-assistance claim without addressing the other prong. *Strickland*, 466 U.S. at 697.

To prevail on the deficiency prong of the *Strickland* test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment. *See Styron v. Johnson*, 262 F.3d 438, 450 (5th Cir. 2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness." *Little v. Johnson*, 162 F.3d 855, 860 (5th Cir. 1998). Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. *See Strickland*, 466 U.S. at 689. "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" *Lockhart v. Fretwell*, 506 U.S. 364, 371 (1993) (quoting *Strickland*, 466 U.S. at 690). A petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation. *See Crockett v. McCotter*, 796 F.2d 787, 791 (5th Cir. 1986); *Mattheson v. King*, 751 F.2d 1432, 1441 (5th Cir. 1985).

To prevail on the prejudice prong of the *Strickland* test, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of

the proceeding would have been different." *Strickland*, 466 U.S. at 694.    In this context, a

reasonable probability is "a probability sufficient to undermine confidence in the outcome."

*Id*. In making a determination as to whether prejudice occurred, courts must review the

record to determine "the relative role that the alleged trial errors played in the total context

of [the] trial." *Crockett*, 796 F.2d at 793.

The United States Supreme Court has held that, under the AEDPA, federal habeas

corpus review of ineffective assistance of counsel claims must be "doubly deferential" in

order to afford "both the state court and the defense attorney the benefit of the doubt."

*Burt v. Titlow*, 571 U.S. 12 (2013) (quoting *Cullen v. Pinholster*, 563 U.S. at 190).    In

*Harrington v. Richter*, 562 U.S. 86, 101 (2011), the Supreme Court discussed the highly

deferential standard of review applicable to an ineffective-assistance claim:

> Surmounting *Strickland's* high bar is never an easy task. An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence. The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.
>
> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. *The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.* The *Strickland* standard is a general one, so the range of

reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). *When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.*

*Id.* at 105 (citations omitted; emphasis added).

Because the state courts rejected his ineffective-assistance claims on the merits and because such claims present a mixed question of law and fact, this Court must defer to the state court decision unless it was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *Moore v. Cockrell*, 313 F.3d 880, 881 (5th Cir. 2002). For the following reasons, the state courts' determination was neither contrary to, nor an unreasonable application of, clearly established federal law.

Verrett maintains generally that defense counsel failed to prepare sufficiently to present a viable defense, such as intoxication, that would negate the specific-intent element of the crime. Under Louisiana law, intoxication is a defense to a prosecution for second-degree murder if the circumstances indicate the intoxication, whether voluntary or involuntary, precludes the presence of specific criminal intent. La. Rev. Stat. § 14:15(2). When defenses that could defeat an essential element of an offense, such as intoxication, are raised by the evidence, the State must overcome the defense by evidence that proves beyond a reasonable doubt that the mental element was present despite the alleged intoxication. *State v. Bland*, 2015-1662 (La. App. 1st Cir. 4/20/16), 194 So.3d 679, 683.

Contrary to Verrett's assertions, the record shows that trial counsel investigated and pursued a voluntary intoxication defense on Verrett's behalf.    He fought vigorously for funding to obtain an expert witness for the defense who was willing to testify regarding the effects of substance abuse, particularly steroids and alcohol, on individuals.    The record shows that he made repeated unsuccessful requests for funding sufficient to retain a doctor with a certain level of expertise.[24]    Counsel secured Dr. Patrick Kent, a licensed psychotherapist, who reviewed the evidence and agreed to testify as an expert witness for the defense about the effects of alcohol and steroid use by Verrett.    However, at a hearing on the defense's motion to allow expert testimony held on February 8, 2012, the trial court determined that Dr. Kent was not qualified through his scientific knowledge and training to testify regarding the physical effects of substance abuse on an individual.    The trial court found that his training and knowledge qualified him to testify only about substance abuse treatment.    Defense counsel objected and informed the trial court that in light of the ruling he intended to submit an amended request to obtain state funds in an attempt to secure an expert with better credentials.    His subsequent attempt failed and no defense expert witness was presented at trial.[25]

Notwithstanding this, the voluntary intoxication defense was still presented at trial,

---

[24]   State Rec., Vol. 1 of 11, Transcript of Hearing on Motion to Allow Expert Testimony, pp. 45, 57-58.

[25]   State Rec., Vol. 1 of 11, Trial Transcript (2/27/12), pp. 35-36.

through multiple lay witnesses, regarding Verrett's consumption of alcohol and his intoxicated state at the time in question, and the defense submitted a special jury charge on voluntary intoxication.[26]    The jury obviously weighed the evidence and rejected the theory. Verrett was not denied the ability to present the defense.    Rather, his point of contention is with the perceived strength of his defense absent expert testimony.

Despite defense counsel's efforts, the amount of funding requested for the level of expertise purportedly warranted by the defense was rejected.    The record evidence supporting the alleged need for the expert was detailed at the hearing on the motion to allow expert testimony.[27]    In any event, defense counsel's level of preparation and efforts to obtain funding for expert witnesses and to secure a proposed expert witness to testify regarding the effects of substance abuse for a voluntary-intoxication defense were objectively reasonable.    Counsel's inability to have the funded expert witness certified in the particular area of expertise necessary was not attributable to any omission on counsel's part.    As the state courts properly determined, defense counsel's professional assistance rendered to Verrett was hardly deficient by *Strickland* standards.

Even if the failure to secure a qualified expert witness could be attributed in part to

---

[26]    State Rec., Vol. 1 of 11, Defendant's proposed jury instructions, R.p. 51, and Instructions to the Jury, R.p. 53.

[27]    State Rec., Vol. 1 of 11, Transcript of Hearing on Motion to Allow Expert Testimony (2/8/12), p. 45.    Dr. Kent based his opinion on Verrett's statements made to him about his alcohol consumption and steroid use and information developed from his children and in police reports.

counsel and somehow be construed as deficient performance, no prejudice resulted such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."    The state courts reasonably rejected his suggestion that the expert testimony about adverse psychological effects from substance abuse might have persuaded the jury that he could not be guilty of second-degree murder. Here, the defense was still able to and did present an intoxication defense at trial without expert witness testimony.    Detective Daigre testified that Verrett detailed how he had been drinking the night of the incident.[28]    Nicholas and Nicole Verrett testified that they knew he had been drinking that night because he smelled of alcohol.    However, they also testified that his behavior did not even suggest to them that he was highly intoxicated.[29]    No factual evidence was adduced to show that he abused steroids or suffered from stress or depression. Despite Verrett's assertion that expert testimony was required to show that his voluntary use of alcohol and steroids precluded the formation of specific intent to commit the crime, the record facts upon which such an opinion could be based were slim.    Moreover, as the state courts determined, an expert's testimony as to the effects of substance abuse on an individual, under these facts and circumstances, simply could not overcome the sheer weight of the evidence showing that he possessed specific intent to kill or inflict great bodily harm,

---

[28]    State Rec., Vol. 2 of 11, Transcript (3/1/12), pp. 135-36 (Detective Jerry Daigre).

[29]    State Rec., Vol. 1 of 11, Transcript (2/29/12), pp. 52-53 (Nicholas Verrett), 104-06 (Nicole Verrett).

as set forth in the appellate court's direct appeal analysis of the sufficiency-of-the-evidence claim.

For these reasons, the state courts' denial of relief on his claim of ineffective assistance of counsel was not contrary to or an unreasonable application of *Strickland*. He is not entitled to federal habeas corpus relief on this claim.

### B.  Denial of Funding for Expert Witnesses

Verrett claims that he did not receive a fair trial because he was denied adequate funding to secure expert witnesses, namely a psychiatrist and a forensic analyst, contrary to the Supreme Court's ruling in *Ake v. Oklahoma*, 470 U.S. 68 (1985). He claims that he lacked the necessary funding to present an adequate defense in violation of his due process rights. He argues that "[t]he *Ake* error prevented [him] from developing his own psychiatric evidence to rebut the State's evidence and to enhance his defense in mitigation." [30] According to Verrett, the experts could have provided valuable assistance in advancing his defense that he was incapable of forming the requisite specific intent. Specifically, he maintains:

> The expert could have rendered his/her opinion of the facts and assisted Defense Counsel with preparation and presentation of the defense and with questions for direct and/or cross-examination. Moreover, another expert for the defense in this case would have been important as testing could have been performed to validate psychological effects of steroids, stress, and depression on Mr. Verrett's state of mind at the time of the offense. Verrett also requested a forensic expert.[31]

---

[30]  Rec. Doc. 3, p. 29.

[31]  *Id.* at 30. On the first day of trial, in the context of pending motions, counsel briefly

The state district court denied the post-conviction claim finding that the absence of the expert testimony did not deny him a fair trial.    The court of appeal and the Louisiana Supreme Court likewise denied the claim without additional stated reasons.

"[W]hen a State brings criminal proceedings against an indigent defendant, it must take steps to ensure that the accused has a meaningful opportunity to present a defense." *Johnson v. Oklahoma*, 484 U.S. 878, 879-80 (1987) (Marshall, J., dissenting) (citing *Douglas v. California*, 372 U.S. 353 (1963) and *Griffin v. Illinois*, 351 U.S. 12 (1956)).    "[A] criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense."    *United States v. Snarr*, 704 F.3d 368, 404-05 (5th Cir. 2013) (quoting *Ake v. Oklahoma*, 470 U.S. 68, 77, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985)).

However, the United States Supreme Court recognizes only limited instances where due process requires that an indigent defendant have access to an expert witness.    In *Ake*, the Supreme Court held that "when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an

---

reviewed with Verrett the requests for funding that had been denied. He noted that the defense sought funding for a forensic expert to review the autopsy, but the request was deemed too expensive because the expert could only examine the autopsy results and not the victim's body, which had been cremated. State Rec., Vol. 1 of 11, Trial Transcript (2/27/12), p. 35.

appropriate examination and assist in evaluation, preparation and presentation of the defense." *Ake*, 470 U.S. at 83.   The Supreme Court cautioned that the right of access to an expert does not mean "that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own."   *Id.*

Notably, the Supreme Court has not explicitly extended the holding with regard to requests for non-psychiatric experts.   *Johnson v. Oklahoma*, 484 U.S. 878, 880 (1987) (Marshall, J, dissenting) (citing *Caldwell v. Mississippi*, 472 U.S. 320, 323 n. 1 (1985).   In *Caldwell*, the Supreme Court declined to reach the issue raised by Caldwell that other types of expert witnesses on issues other than sanity may be constitutionally required because the petitioner did not present a strong enough case to warrant such experts.   *Caldwell*, 472 U.S. at 323 n. 1 ("Given that petitioner offered little more than undeveloped assertions that the requested assistance would be beneficial, we find no deprivation of due process in the trial judge's decision [denying appointment of a criminal investigator, a fingerprint expert, and a ballistics expert]. *Cf. Ake v. Oklahoma*, 470 U.S. 68, 82–83, 105 S.Ct. 1087, 1096–1097, 84 L.Ed.2d 53 (1985) (discussing showing that would entitle defendant to psychiatric assistance as matter of federal constitutional law). We therefore have no need to determine as a matter of federal constitutional law what if any showing would have entitled a defendant to assistance of the type here sought."); *see also Brown v. Cain*, Civ. Action No. 11-2267, 2011 WL 7042222, at *24 (E.D. La. Dec. 20, 2011), *recommendation adopted* 2012 WL 123288 (2012) (petitioner failed to establish that counsel was deficient in failing to request *Ake* funds

to secure a non-psychiatric expert or investigator to assist in presenting a self-defense claim).

With regard to non-psychiatric expert witnesses, the United States Fifth Circuit Court of Appeals has explained:

> "[A] criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense." *Ake v. Oklahoma*, 470 U.S. 68, 77, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). However, an indigent defendant does not have an automatic right to expert assistance upon demand. *Yohey v. Collins*, 985 F.2d 222, 227 (5th Cir.1993). Under *Ake*, the government must "assure the defendant access to a competent psychiatrist" when he "demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial." 470 U.S. at 83, 105 S.Ct. 1087. Non-psychiatric experts "should be provided only if the evidence is 'both critical to the conviction and subject to varying expert opinion.' " *Yohey*, 985 F.2d at 227 (quoting *Scott v. Louisiana*, 934 F.2d 631, 633 (5th Cir.1991) (internal quotation marks omitted)).

*United States v. Snarr*, 704 F.3d at 404-05.    In *Snarr*, the court of appeals stated that a showing of reversible error based on inadequate funding for experts requires that a defendant "establish a reasonable probability that the requested experts would have been of assistance to the defense and that denial of such expert assistance resulted in a fundamentally unfair trial."    *Id.*

Verrett contends he was entitled to an independent expert psychiatrist under *Ake*. However, he has failed to show that the state-court determination regarding the denial of adequate funding for the assistance of a requested psychiatric expert witnesses for his defense of intoxication, was contrary to or an unreasonable application of *Ake*.    Unlike *Ake*,

Verrett did not show that his sanity at the time of the commission of the offense would be a "significant factor" at trial.    His mental competence was not an issue at trial.    Instead, he sought the expert psychiatric testimony to bolster his defense that his voluntary intoxication or other significant impairment from depression or steroid use precluded him from forming the specific intent necessary for second-degree murder.    *See Brancaccio v Warren*, Civ. Action 08-14116, 2011 WL 1812200, at *18 (E.D. Mich. March 29, 2011), *recommendation adopted* 2011 WL 1810147 (defense of intoxication to negate specific-intent crime is not one of legal insanity governed by *Ake*); *Miller v. Bell*, 655 F.Supp.2d 838, 851 (E.D. Tenn. Sept. 10, 2009).

Nor did Verrett place his sanity at issue by offering his own unsupported statements that he abused steroids and alcohol to advance his intoxication defense.    Here, there was absolutely no objective evidence to show that Verrett suffered from clinical depression or stress.    Moreover, as his proposed expert, Dr. Kent, acknowledged during the pretrial motion hearing, there was no record evidence other than Verrett's own general claims of steroid usage and estimated consumption of alcohol upon which to base an expert opinion.[32] Dr. Kent candidly admitted that his calculation as to Verrett's blood alcohol level was merely an estimate based on Verrett's own assertions. [33]    The evidence presented at trial

---

[32]  State Rec., Vol. 1 of 11, Hearing Transcript (February 8, 2012), pp. 24-25, 29-30. *See also*, State Rec., Vol. 2 of 11, Trial Transcript, 3/1/12 ((Terry Daigre), p. 136.

[33]  State Rec., Vol. 1 of 11, Hearing Transcript (February 8, 2012), pp. 32-33, 41.

contradicted his claims of steroid abuse.[34]    Lay witness testimony at trial from his children and his sister also conflicted with his account that he was highly intoxicated at the time of the murder or had a history of habitual alcohol abuse.[35]    For all of these reasons, Verrett did not demonstrate that his sanity at the time of the offense would be a significant factor at trial, necessitating the assistance of an independent psychiatrist.    *Ake*, 470 U.S. at 83.

As for his inability to obtain funding to secure a forensic expert witness, the state-court determination could not be contrary to, or an unreasonable application of, *Ake*.    The Supreme Court in *Ake* did not hold that an indigent defendant is entitled to other types of experts, such as forensic or other non-psychiatric expert witnesses, or even what circumstances, if any, would entitle an indigent defendant to non-psychiatric expert assistance as a matter of federal constitutional law.    *Caldwell*, 472 U.S. at 323 n. 1.

Furthermore, the state courts correctly found that Verrett failed to demonstrate a reasonable probability that the experts he requested would aid in his defense of intoxication or other significant mental impairment to show he lacked the requisite specific intent or that the denial of the expert witnesses resulted in an unfair trial.    As the state district court reasoned, "the uncontradicted evidence in this case was to the effect that immediately after stabbing his wife eighteen times, the defendant did not contact the police, but instead fled,

---

[34]    Trial Transcript, 2/29/12 (Nicholas Verrett), p. 98.

[35]    Trial Transcript, 2/29/12, (Nicholas Verrett), pp. 52-53, 96-97; (Nicole Verrett), p. 105, 131, 140; (Michelle Parfait), pp. 153, 166.

lied to everyone about her whereabouts, and tried to cover up and destroy evidence. Under these circumstances, it is highly unlikely that expert evidence would have persuaded the jury that he lacked the requisite intent to commit the crime of second degree murder." [36]

Moreover, as previously discussed, there were no tests conducted as to Verrett's blood alcohol content around the time of the murder and his children's testimony as to their observations of Verrett contradicted his intoxication theory and tended to disprove that he was so intoxicated that he could not have formed the requisite intent.    The State's forensic expert was available for cross-examination at trial regarding the autopsy results.    No defense forensic expert was proven necessary under the circumstances.    Verrett has not demonstrated that the expert was "reasonably necessary" to his defense.    *Caldwell*, 472 U.S. at 323 n. 1.    He also failed to establish that he was denied a fundamentally fair trial based on inadequate funding for the expert.

For these reasons, Verrett fails to demonstrate that the state-court determination denying relief on this claim was either contrary to or an unreasonable application of federal law as established by the Supreme Court.

C.  *Denial of Change of Venue*

Verrett claims that he was denied due process and a fair trial when the trial court denied his motion for a change of venue.[37]    He argues that his family contacts throughout

---

[36]  State Rec., Vol. 3 of 11, District Court Judgment denying PCR, R.p. 1300.

[37]  Verrett's memorandum relies in part on state law, including Louisiana Code of Criminal Procedure article 622.    Under Louisiana law, a trial court must change the venue

the parish and the highly publicized nature of the case made it impossible for him to have an

impartial jury trial.    The state courts rejected this claim on post-conviction review.    In the

last reasoned decision, the state district court denied the claim, stating:

> On February 27, 2012, the defendant, through counsel, filed a Motion for Change of Venue, in which he asserted:
>
> > "The Defendant moves this Court for a change of venue on the basis that pretrial publicity, as well as the victim's contacts throughout this parish, have necessarily prejudiced the public mind against the defendant rendering a fair and impartial trial impossible in this Parish."
>
> That same day, in response to the motion, the court ordered that a hearing be held "following jury selection to determine whether the motion should be granted."
>
> Immediately following the completion of jury selection on February 28, 2012, defense counsel reurged the motion.    For reasons explained in open court, the court denied the motion and the case proceeded to trial.
>
> The court has reviewed the jury selection proceedings in this matter, and the original reasons given for denial of the motion for change of venue.    The court sees no reason to change its ruling.    The defendant's right to a fair and impartial jury trial was not violated by this ruling of the court.[38]

---

of a prosecution "when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending." La. Code Crim. P. art. 622.    However, to the extent Verrett contends he should be entitled to federal habeas corpus relief because the state court misapplied state law in denying his motion for a change of venue, the claim is not cognizable.    Federal habeas review encompasses only federal constitutional violations and noncompliance with federal law as interpreted by the United States Supreme Court.    *See Swarthout v. Cooke*, 562 U.S. 216, 219 (2011); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

[38]    State Rec., Vol. 3 of 11, District Court Judgment denying PCR.

The "original reasons" the post-conviction court referred to in denying the post-conviction

claim, as set forth previously by the trial court in denying the motion for change of venue,

were as follows:

> It is obvious to the Court there was no difficulty picking a jury in this case. There is no evidence of adverse publicity or publicity of any kind to the extent that it in any way significantly impacted the jury selection process in this case. I'm convinced that Mr. Verrett can get and will get a fair trial in this case with a fair and impartial jury despite the limited exposure that some of the jurors had to media publicity in this case.    I think on the first panel, if I recall, and I don't recall, it was I think two people that had, maybe three that heard about the case.    On the second panel I think there were seven and on the third panel there were three.    And not all of that information came from the media. Some of that came from other sources like acquaintances, friends, family, coworkers, and that sort of thing.    So it's obvious to me that the publicity in this case has not significantly impacted the jury selection process and that Mr. Verrett will be able to receive a fair trial with a fair and impartial jury.[39]

For the following reasons, the state-court decision rejecting the post-conviction claim for

relief was not an unreasonable application of, nor contrary to, clearly established federal law.

Nor was the state-court decision based on an unreasonable determination of the facts in light

of the evidence presented.

"The Sixth Amendment guarantees a defendant's right to trial before an impartial

jury." *Murray v. Schriro*, 882 F.3d 778, 802 (9th Cir. 2018) (citing *Skilling v. United States*,

561 U.S. 358, 377 (2010)); U.S. Const. amend VI ("In all criminal prosecutions, the accused

shall enjoy the right to a ... trial, by an impartial jury...."). "Because 'trial by jury in criminal

cases is fundamental to the American scheme of justice,' the Due Process Clause of the

---

[39]  State Rec., Vol. 2 of 11, Trial Transcript, (2/28/12), p. 358.

Fourteenth Amendment guarantees the same right in state criminal prosecutions." *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 551 (1976) (quoting *Duncan v. Louisiana*, 391 U.S. 145, 149, 88 S.Ct. 1444, 1447, 20 L.Ed.2d 491 (1968)).    A criminal defendant's right to a fair trial is an essential part of our system of justice.    *Nebraska Press Assn. v. Stuart*, 427 U.S. at 551 (citing *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955)).

Trial courts have the duty to ensure that media coverage does not affect the fairness of the proceeding.    *Sheppard v. Maxwell*, 384 U.S. 333, 362-63 (1966).    A defendant may request a "transfer of the proceeding to a different district ... if extraordinary local prejudice will prevent a fair trial—a basic requirement of due process."    *Skilling v. United States*, 561 U.S. 358, 378, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010) (quotations and citation omitted). "Juror exposure to news reports of a crime—even 'pervasive, adverse publicity'—is not enough alone to trigger a presumption of prejudice to the defendant's due process rights." *Murray v. Schriro*, 882 F.3d at 802 (quoting *Skilling*, 561 U.S. at 382-84) ("describing the 'vivid, unforgettable' and 'blatantly prejudicial' information at issue in the handful of cases in which the Supreme Court has presumed prejudice from pretrial publicity") (citations omitted).    Rather, a presumption of prejudice "attends only the extreme case."    *Skilling*, 561 U.S. at 381, 130 S.Ct. at 2915; *see also Rideau v. Louisiana*, 373 U.S. 723, 726–27 (1963) (where a defendant brings forth evidence of inflammatory and prejudicial pretrial publicity that so pervades the community so as to render virtually impossible a fair trial by an impartial jury drawn by that community, jury prejudice is presumed and there is no further

duty to establish bias).    Otherwise, a state defendant who seeks relief stemming from pretrial publicity impacting jury selection must demonstrate an actual, identifiable prejudice on the part of members of the jury that is attributable to the publicity.    *See Moore v. Johnson*, 225 F.3d 495, 504 (5th Cir. 2000) (citing *Willie v. Maggio*, 737 F.2d 1372, 1386 (5th Cir. 1984)); *Logan v. Cain*, Civ. Action No. 11-2381, 2013 WL 3293659, at *9-10 (E.D. La. June 28, 2013).

Verrett claims that he could not get a fair trial because "this case was widely published and known by the members of the city…. [t]he jury members were so familiar with the case that they were sharing information from their phones concerning the case."[40]    Verrett cites no objective evidence of the widespread publicity he claims existed.    He also asserts generally that the victim was acquainted with the District Attorney's Office and that she and her family were well-known and liked in their small community.[41]

In this case, the jury venire was made up of 45 venirepersons split into three panels

---

[40]  Rec. Doc. 3, p. 37.

[41]  The victim's family's contacts with the District Attorney's Office was the basis of a defense Motion for Recusal of the District Attorney's Office.    That motion was heard on the first day of trial and denied.    State Rec., Vol. 2 of 11, Transcript (2/27/12), pp. 10-24.    It was alleged that the victim's brother, Corey Brunet, had developed a relationship with the District Attorney's Office over the years in his official capacity as a state trooper. However, his testimony at the pretrial hearing revealed he was involved in the case involving his sister only in a personal capacity. The State had no intention of calling him as a witness at trial. The trial court found that Brunet's personal interest in the case involving the murder of his sister and his concern surrounding his niece and nephews in no way served as grounds to recuse the District Attorney's Office for having a "personal interest in the cause which is in conflict with fair and impartial administration of justice."

of 15 prospective jurors.     Of the 45 members, a total of 12 individuals had heard or read

something about the murder.     The trial court, along with the prosecutor and defense

counsel, interviewed each of those 12 venirepersons separately and individually, asking

pointed questions as to what specific details they possessed, where they learned the details,

and the impact, if any, the independent knowledge had on their ability to weigh the evidence

presented at trial.[42]     The vast majority of the 12 with knowledge possessed only limited,

general details gleaned from news articles they saw a year and a half before trial when the

crime occurred.     Some of the jurors had even obtained details from sources besides the

media, such as friends, relatives or coworkers.     Only a few prospective jurors had viewed

something in the media shortly before trial.     Two venirepersons viewed an online article

together on a cell phone in the jury room.     However, targeted questioning about that event

made it clear that only those two prospective jurors were involved in that incident.[43]

Under the circumstances, Verrett's generalized assertion that the case was widely publicized

sharply conflicts with record evidence that most prospective jurors only had vague recall of

the case from dated news articles, and only two venire members shared an online article

about the murder case in the jury room.     His unsupported assertion hardly establishes

pervasive inflammatory and prejudicial pretrial publicity of the nature contemplated by

---

[42]  State Rec., Vol. 1 of 11, Transcript (2/27/12), pp. 101-112; State Rec., Vol. 2 of 11, Transcript (2/28/12), pp. 61-110 and 249, 262-287; *see also* State Rec. Vol. 1, Minute Entries from February 27 and 28, 2012.

[43]  Vol. 2 of 11, Transcript (2/28/12), pp. 65-69, 80-92.

Supreme Court precedent as presumptively prejudicial.

Nor has he established on these facts a violation of due process based upon actual prejudice during jury selection stemming from pretrial publicity. Notably, Verrett does not reference any specific prejudice or bias possessed by any individual juror. The prospective jurors who were vaguely familiar with the case through the media overwhelmingly stated they would not be influenced by their general knowledge and would be able to base their judgment on the evidence presented at trial. The few who had greater contacts with individuals who were in any way connected to the murder and possessed knowledge about the case were excused for cause.[44]   A review of the record reveals that none of the 12 prospective jurors with independent knowledge actually served on the jury.[45]   No actual prejudice due to pre-trial publicity was established under *Skilling*.

Finally, Verrett has not shown juror impartiality based on the victim's family contacts in the parish. Verrett offers nothing specific underlying his assertion. The record itself demonstrates that only one prospective juror was even familiar with the victim or her family.[46]   That prospective juror, who belonged to the same gym as the victim and her

---

[44]   State Rec., Vol. 1 of 11, Minute Entry 2/28/12 (Panel 2: B. Boudreaux and Ardoin excused for cause and Panel 3: Allemand and Dempster excused for cause).

[45]   The remaining prospective jurors were peremptorily challenged by the defense and excused.

[46]   State Rec., Vol. 1 of 11, Transcript (2/27/12), p. 89; State Rec., Vol. 2 of 11, pp. 58, 250.

family members, was excused for cause.[47]

For these reasons, Verrett has not demonstrated that the state-court rejection of his claim was based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceedings.   The state-court decision was neither contrary to, nor an unreasonable application of, Supreme Court precedent.   Accordingly, Verrett is not entitled to federal habeas corpus relief on this claim.

   D.  *Cumulative Error*

Verrett claims that he was denied a fair trial due to cumulative error, *i.e.*, "the combined effect of the errors presented herein, which is the blatant ineffective assistance of counsel rendered prior to and during trial of this matter which is more aptly described as a constructive denial of counsel."[48]   In support of the claim, he relies on *Derden v. McNeel*, 938 F.2d 605, 610 (5th Cir. 1991).   In *Derden*, the United States Fifth Circuit Court of Appeals recognized an independent claim based on cumulative error applicable in the rare instance where "(1) the individual errors involved matters of constitutional dimensions

---

[47]  State Rec., Vol. 2 of 11, Transcript (2/28/12), pp. 285-87.

[48]  Rec. Doc. 3, p. 38. He referenced cumulative error as part of his sole ineffective-assistance claim, arguing that "had counsel conducted adequate investigation, discovery, interviewed and called witnesses, requested the necessary funds to acquire expert assistance in preparation and presentation of the defense and scientific evidence, and then properly prepared and presented [his] defense utilizing the facts, evidence, and testimony for confrontation, thus placing the state's case to meaningful adversarial testing – there is more than a reasonable probability that the outcome of the trial would have been different." Rec. Doc. 3, pp. 25-26.

rather than mere violations of state law; (2) the errors were not procedurally defaulted for

habeas purposes; and (3) the errors 'so infected the entire trial that the resulting conviction

violates due process.' "    *Id.* (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).    Verrett

cites no Supreme Court precedent governing claims of cumulative error.    Thus, he has not

shown that the state-court determination rejecting such a claim was contrary to or an

unreasonable application of clearly established Federal law, as articulated by the United

States Supreme Court.    *See Chester v. Vannoy*, Civ. Action No. 16-17754, 2018 WL 2970912,

at *31 (E.D. La. June 11, 2018).    Furthermore, as previously discussed, his claims lack merit.

Therefore, no errors exist to cumulate.    In fact, his cumulative error claim mirrors his

ineffective-assistance-of-counsel claim, which lacks merit for the reasons already explained.

In any event, his attempt to aggregate non-errors to establish an independent claim of

cumulative error must fail.    *See United States v. Cervantes*, 706 F.3d 603, 619 (5th Cir.

2013).    This claim does not warrant habeas relief.

## **RECOMMENDATION**

For the foregoing reasons, it is **RECOMMENDED** that Verrett's application for federal

habeas corpus relief be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and

recommendation in a magistrate judge's report and recommendation within fourteen (14)

days after being served with a copy shall bar that party, except upon grounds of plain error,

from attacking on appeal the unobjected-to proposed factual findings and legal conclusions

accepted by the district court, provided that the party has been served with notice that such

consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); *Douglass v. United*

*Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[49]

New Orleans, Louisiana, this ___29th___ day of _____July_____, 2019.

_____
**MICHAEL B. NORTH**
**UNITED STATES MAGISTRATE JUDGE**

---

[49]  *Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.